## ST. LOUIS, S. F. & T. RY. CO. v. REICHERT. (No. 8424.)

(Court of Civil Appeals of Texas. Dallas. Jan. 8, 1921. Rehearing Denied Feb. 5, 1921.)

**1. Master and servant ☞286(31)—Negligence in rerailing wrecked car held question for jury.**

In an action by a member of a railroad wrecking gang whose leg was broken when a cable used to pull derailed cars on the tracks was tightened, the question of the negligence of the railroad company *held* for the jury.

**2. Appeal and error ☞1001(1)—Verdict supported by evidence not disturbed.**

A verdict supported by evidence will not be disturbed on appeal.

**3. Master and servant ☞217(7)—Risk of dangers discoverable by ordinary care assumed.**

A servant assumes the risks of dangers of which he has actual knowledge, and of such hazards as he should have learned by the ex-

ercise of ordinary care, but, in the absence of knowledge to the contrary, he may rely on the assumption that the master will do his duty, and is not under obligation to look out for the master's negligence.

**4. Master and servant ☞288(16) — Assumption of risk of injury by rerailing wrecked car held question for jury.**

Where plaintiff, a member of a railroad wrecking gang rerailing a car, was injured by the tightening of a wire cable jerked by a movement of the locomotive, evidence *held* not to show as a matter of law that in moving the cable between the rails he was acting on his own volition, and therefore assumed the risk, but to warrant submission of a finding that he was acting under the orders of his superiors.

**5. Trial ☞351(5)—Refusal of requested special issue proper where covered by issues submitted.**

In an action for injuries suffered by plaintiff member of a railroad wrecking gang, whose leg was broken by the tightening of a wire cable, where the issues were whether defendant was guilty of negligence in moving the engine to which the cable was attached, etc., and whether it was the proximate cause of the injuries, the refusal of a requested special issue as to whether at the time of the injuries the engine was being moved in the usual and customary way was not error; the issues in the case being correctly submitted.

**6. Negligence ☞141(12)—Charge on damages recoverable by railroad employé guilty of contributory negligence held sufficient without special issue.**

Where in an action by a railroad employé the court correctly charged the jury in accordance with Vernon's Sayles' Ann. Civ. St. 1914, art. 6649, that the damages in event of his contributory negligence should be diminished in proportion to the amount of the negligence attributable to the employé, the refusal of a special issue requiring the jury to find the total amount of damage suffered and the amount of the diminution was not error, particularly where there was no assertion that the amount awarded was excessive.

**7. Witnesses ☞252—Pictures illustrating testimony of medical experts admissible.**

In a personal injury action, pictures of muscles described by physicians which they testified were correct were admissible as part of such description.

Error from District Court, Grayson County; Silas Hare, Judge.

Action by Adam Reichert against the St. Louis, San Francisco & Texas Railway Company. Judgment for plaintiff, and defendant brings error. Affirmed.

McReynolds & Hay, of Sherman, for plaintiff in error.

Randell & Randell, of Sherman, for defendant in error.

TALBOT, J. This is a personal injury suit. The defendant in error, hereinafter

designated as plaintiff, was in the employment of the plaintiff in error, referred to as defendant, as a member of what was known as the "truck or wrecking gang." On the 25th day of September, 1917, he and others of said gang were required to go from Sherman to Celina, Tex., to assist in "picking up the wreck of a passenger train which had been derailed." This work included the rerailing of the cars. J. E. Breedlove was foreman of the crew, and J. W. Reddick was the "straw boss or lead man." A wire cable about 1⅛ inches thick and 100 feet long was used in pulling the derailed cars on the track. The cable would be fastened one end to the truck of the car and the other to a locomotive in charge of an engineer. The engineer in obedience to signals given by the foreman, and perhaps at times by other members of the crew, would start and move the locomotive as was necessary to draw the car onto the railway track. It was necessary, in order to get the wheels of the derailed car in position to be pulled onto the iron rails of the track, to attach the cable to the side of the truck so that when the engine was moved for the purpose of rerailing the car the effect would be to "slue" the trucks and car, to draw them back to the iron rails, and then by means of blocks placed by the side of the rails and the continued movement of the engine the wheels of the car are moved onto the blocks and then onto the iron rails. While engaged in this work, and while the locomotive of the defendant was being operated for the purpose of pulling a car on the track on the occasion in question, the cable "flew back," struck the plaintiff's leg, broke it, and seriously injured him. The negligence charged is that the employés of the defendant engaged with plaintiff in doing the work assigned them negligently, and without any notice to plaintiff or otherwise, moved and jerked the cable and caused the same to be moved and jerked by their negligence while plaintiff was engaged in his duties, causing the same to jerk plaintiff and strike him upon the leg, resulting in his injuries. The defenses pleaded by the defendant were a general denial, that at the time the plaintiff sustained the injuries complained of he was engaged in interstate commerce, and that said injuries were caused by his own contributory negligence and by one of the risks incident to his employment. The case was submitted to the jury on special issues, and upon motion of the plaintiff, based on the findings of the jury, judgment was rendered in favor of the plaintiff for $6,000, and the defendant appealed.

The defendant requested the giving of a special charge directing the jury to return a verdict in its favor, and the refusal of this charge is assigned as error. The proposition advanced is as follows:

"The overwhelming evidence in the case being to the effect that at the time plaintiff was injured the work of rerailing said car was being done in usual and customary manner, that plaintiff himself being an experienced man and knew the dangers incident to the manner of doing such work, there being no proof of any act of negligence on the part of the employés engaged in rerailing said car, the jury should have been instructed to return a verdict in favor of defendant; the plaintiff having assumed all the risks ordinarily incident to his employment."

[1] The testimony upon the issue of negligence vel non on the part of the defendant is conflicting, but, after a careful examination and consideration of it, we conclude it is sufficient to support the judgment. The plaintiff, after testifying that he had been in the employ of the defendant about a year and six months when he received his injuries, said:

"On the 25th day of September there was a wreck at Celina of a passenger train derailed, and in order to get this derailed passenger train in condition to move again it was necessary to pull one car at a time with a cable. We worked at this wreck all night and until in the morning about 7:30 o'clock. As before stated, we used a cable in pulling the cars on the track. We also have to do what is called 'sluing' the trucks. We have to slue the trucks and prize them around to get them in shape to be pulled by the cable. We fasten the cable to one side of the truck, and turn it to get it on the rail as we pull on the car, and when we get the trucks to the rail, we rerail them. That was a wire cable about 1⅛ inches thick. The cable we were using at that time was about 100 feet long, and was attached to the locomotive, and run from the locomotive to the truck of the car. I fastened the cable to the truck; that was part of my work. At the time I attached the cable to the truck it was lying along outside of the truck. J. W. Reddick was working with me. Tom Breedlove is the wrecking foreman, and Reddick was the straw boss or lead man. Reddick helped me fasten the cable to the truck. He and I did that together. He was the leading man on that side, and we were working together. It was necessary to attach the cable to the truck and let the engine pull it. My orders were to take the cable and attach it to the truck and slue the truck in order to make it pull it to the rail, and lay the cable at the proper place to make the pull; in other words, to put the cable in its proper place to pull. The proper place for the cable when the pull was made would be on the track inside of the rail. Before I started to put the cable in its proper place, it was lying out on the outside of the track. Reddick and I had hold of the cable in an effort to lay it over on the inside of the track, and the engine made a jerk and jerked me inside of the rail with this foot, and the cable flew back and broke my leg. I did not know that the engine was going to move or jerk the cable. If I had known it I would not have taken hold of the cable. On the side of the track was not the proper place for the cable, and that was the reason I did not leave it there. The reason this was not the proper place for it was because there was a new track laid there, and the rail was high above the ground, about a foot from the ground,

and the cable would have pulled against the track. I had been putting the cable over the track before that. The car we were working on at the time I was injured was the last car we had to put on. They had jerked none ·of the others that way while I had hold of the cable. I did not have time to put the cable over the rail and on the track before the jerk came, and on other occasions when I had done it the same way I had ample time to lay the cable over in the track and in proper position before the pull was made. Prior to the time I was hurt, during the time we were rerailing this train, the night before, I had put the cable over the track in the same manner quite often; I could not say how many times. Breedlove was present at the scene of the wreck at the time I was hurt and during the time the work of re-railing the cars was being performed. At the time the jerk of the cable came, I had hold of the cable, and was jerked over next to the rail, and the cable flew back and hit me on the leg. At that time I did not think my legs were hurt or at least broke, but I thought I was hurt through my chest. I spat to see if I was spitting blood, and then started to walk off and fell. I started off, and my leg gave way, and I fell. * * * The passenger train that was wrecked was a through train from Kansas City, Mo., to Fort Worth, Tex. * * * Breedlove had charge of the gang, and J. W. Reddick worked there for 10 years, and maybe for 18 months he was the lead man. He was a more experienced man than I. * * * I don't know who gave the signal to the engineer to move the engine. I had nothing to do with giving the signal. I expect the foreman ought to know when it was ready to be moved. * * * I did not see the engine move. I first found out that the engine was moving when it jerked me. I took hold of the cable to lay it over in the track. It was lying on the ground, and Reddick and I got hold of it together to put it over on the track. The foreman, Jim Breedlove, told me to take hold of the cable. * * * It was part of my duty when there was a wreck out on the road at any place to go to the scene of the wreck with that gang and rerail the cars. I had done that a good many times before I was injured. I was familiar with the manner and way in which the cars were customarily rerailed. I knew the way the work was ordinarily and customarily done. The work we were doing at Celina was being done in the ordinary and customary way. I do not know who gave the signal for the engineer to move the engine; I had nothing to do with giving the signal. Reddick had nothing to do with giving the signal. The man that gave the signal I presume knew when the cable was attached and it was time for the engine to be moved. Somebody ought to know if it was time to move the engine. I expect the foreman ought to know when it is ready to be moved. * * * The cable was lying on the ground when I took hold of it. I did not give it a throw. * * * The engine gave the cable a jerk, and it jerked me into the track. The cable hit me when it jerked me into the track. * * * I had hold of the cable when the engine started and jerked it. I found out the engine was moving about the time my leg was broken. The engine did not take the slack out of the cable; it jerked it out."

The defendant's foreman, Breedlove, testified that after the cable was attached to the truck of the car and the locomotive he notified the engineer or had the engineer notified to move the engine, but that he was directed to move it back slowly and stretch the slack out so there would be no jerk in drawing the truck up; that he "told everybody to watch out that we would move back now and slue the truck around, and that the engine as it went backwards just barely rolled back"; that "when the engine started to move no one took hold of the cable that I know of. The work at the time was being done in the usual and ordinary way and the way that ordinarily straightened the truck." He further said that it was dangerous to move the engine while one of the men had hold of the cable, and that it was dangerous for the men to take hold of the cable while the engine was moving, and that he did not know whether the plaintiff had hold of the cable before the engine started or took hold of it after the same started. There was also testimony by the "straw boss," Reddick, to the effect that the cable was lying on the outside of the rail, and that they had blocks there so the trucks would run on the blocks; that when the engine started to move he saw the cable was going to catch on the blocks and that he could lift it up and throw it in the railroad track and thereby prevent the tearing up of the blocks; that he picked up the cable and was not making much headway with it, and the plaintiff went over by the truck and took hold of it to help get it in the track; that the cable straightened out quicker than he thought it would and caught plaintiff's leg and he was hurt; that he did not think there was anything unusual about the movement of the engine either in speed or in the manner of running it; that so far as he knew there was not. He further said that he had hold of the cable himself when the slack came out, but that he let it loose about the time it was getting tight.

[2, 3] There is more testimony bearing on the question presented by the defendant's proposition, but we deem it unnecessary to an understanding of this opinion to detail it in full. The theory of the plaintiff was and is that the employés of the defendant operating the cable at the time plaintiff was injured were guilty of negligence in moving the engine and in the manner in which it was moved while plaintiff had hold of it and endeavoring to place it on the railroad track in the performance of his duty without notice to plaintiff or knowledge on his part that it was going to be then moved, and that such negligence was the proximate cause of his injuries; while the theory of the defendant was and is that the engine was started before plaintiff took hold of the cable and in drawing the cable taut was moved very slowly

and without negligence or fault on defendant's part; that at the time the plaintiff was injured the work in which he and his colaborers were engaged was being done in the usual and customary manner, and that plaintiff, being an experienced man, knew the dangers incident to the manner of doing such work and assumed all the risks incident thereto. There was evidence sufficient to justify the jury in finding in favor of either of these theories, but the jury resolved the matter in favor of the plaintiff, and under well and long established rules in this state we would not be authorized to disturb their verdict. The case is unlike and not controlled by the decision of our Supreme Court in Railway Co. v. Hynson, 101 Tex. 543, 109 S. W. 929, or cases following it. The negligence complained of in Hynson's Case was passive, whereas the negligence here asserted was active. The rule is clearly established in this state by the Hynson Case and other like cases that—

The servant "assumes the risks of a danger of which he has actual knowledge, and of such hazards as he would have learned by the exercise of that ordinary circumspection which a prudent man would have used in the particular employment. Since, in the absence of knowledge to the contrary, he may rely upon the assumption that the master will do his duty, he is under no obligation to look out for the master's negligence."

Of course, he cannot shut his eyes to dangers that are obvious to an ordinary man. There is no question but that the plaintiff is charged, under the evidence, with knowledge of the general customary way of doing the work in which he was engaged, but he asserts that the defendant's servants in rerailing the car in question did not pursue the usual and customary way of doing such work, in that, while the usual method of drawing derailed cars on the railroad track by means of a cable fastened to the truck of the car and to a locomotive was observed, they departed from their safe and customary habit of not moving the engine without notice or knowledge on the part of those assisting in the work that it was then going to be moved, and without suddenly jerking the cable taut, and without such notice to or knowledge on the part of the plaintiff, and while he had hold of the cable, moved the engine in a way to cause the cable to be drawn taut with a jerk, thereby causing the injuries of which he complains; in other words, that the negligence and danger here, as insisted upon by the plaintiff, consisted in the departure in part from the usual and customary way of rerailing wrecked cars, and in causing the cable to be jerked taut without warning to plaintiff or knowledge on his part, and while he had hold of the cable in the discharge of his duty. The plaintiff, as shown above, testified that he did not know that the engine was going to move or

jerk the cable; that if he had known it he would not have taken hold of the cable; that prior to the time he was hurt and during the time they were rerailing the train at Celina he had put the cable between the rails of the track quite often in the same manner he did when it struck him, and on no other occasion was the cable jerked as it was when he was hurt. The danger in Hynson's Case, as pointed out in the opinion of the Supreme Court, consisted in the condition of the track where Hynson was at work; that is, in the failure of the railroad company to block the guard rails, a condition "which was obvious to a casual observation" of the rail. As much cannot be said of the danger in the present case. Here, according to the testimony of the plaintiff, he was in the act of doing, when injured, what the defendant's foreman had directed him to do, and the danger to be incurred in obeying the instructions given him did not consist in any defective condition of the railroad track or instrumentality with which he was working, but in the negligent moving of the engine to which the cable was attached, and which plaintiff says was moved without warning to him or knowledge on his part that it was going to be moved. The court gave the jury correct definitions of negligence, proximate cause, and "assumed risk," and, with such definitions to guide them, the jury found that the plaintiff was injured by reason of the moving of the cable at the time it was moved, and that the employés of the defendant operating the cable were guilty of negligence in moving it in the manner and under the circumstances it was moved, that such negligence was the proximate cause of plaintiff's injury, and that the plaintiff's injury was not caused by one of the risks ordinarily incident to his employment.

[4] It cannot fairly be said, as a matter of law under the evidence, that the plaintiff, in endeavoring to put the cable on the track, was doing an unnecessary act of his own volition, and therefore he assumed the risk of injury therefrom. He testified that the foreman, Breedlove, "told me to take hold of the cable; he gave Reddick and me a command to pick it up," and the witness Reddick, the straw boss, said:

"I was the next man to Breedlove in authority. * * * Plaintiff and I were working together. We could have left the cable out there (outside the track), and let it tear up the blocks, but we (he and plaintiff) lifted it up to keep it from doing that. * * * It was the proper way to keep it from tearing up the blocks. * * * The cable was not in position to be pulled, nor to pull the trucks and straighten them until it (the cable) was in the track. The cable was lying outside the track before the pull was ready to be made, and was in a position where it would pull up the blocks if a pull was made. * * * I did not think I was doing anything wrong when I undertook to pick up the cable and put it in the track.

* * * I did not realize I was doing anything dangerous. It was our duty to do the work. * * * Plaintiff and I were engaged in picking up the cable and trying to throw it in the track."

The evidence was sufficient to justify the findings of the jury stated above, and the defendant's requested charge directing the jury to return a verdict in its favor was correctly refused.

[5] The defendant requested submission of the following issue:

"At the time plaintiff was injured was the engine being moved and the work being done in the usual and customary manner of doing said work?"

This request was refused and its refusal assigned as error. The proposition under this assignment simply is that the defendant was entitled to have the jury pass on the question of whether or not the work was being done in the usual and customary manner; and the court erred in refusing to submit this question to the jury. We think there was no material error in the action of the court. The issues in the case were whether or not the defendant was guilty of negligence in moving the engine and cable at the time and under the circumstances shown, and was such negligence the proximate cause of the plaintiff's injuries? These issues were properly submitted in the court's charge, and no prejudice could have resulted to the defendant by the refusal to submit the question under consideration. The real question involved was one of negligence in performing the work, and not as to the method employed in doing it.

[6] The court gave the jury proper instructions to guide them in determining the issue of damages, and by question No. 9 they were asked what amount of money as a present cash payment would fairly compensate the plaintiff for his injury. By question No. 4 they were asked whether or not the plaintiff failed to exercise ordinary care for his own safety in attempting to move the cable in the manner he did, and by question No. 5 they were asked, in the event they found that the plaintiff failed to exercise such care, whether or not such failure contributed to cause his injury. In connection with these issues they were charged as follows:

"You are further instructed that, if you find and believe from the evidence that plaintiff was guilty of contributory negligence, as that term has been heretofore defined to you, you will diminish the amount you would otherwise find in answer to said question No. 9 in proportion to the amount of negligence attributable to plaintiff."

The defendant requested submission of the following question:

"If you have answered question 5 in court's charge in the affirmative, then to what extent should the amount of damages you have found in answer to question 9 be diminished on account of the contributory negligence of the plaintiff? In answering this question you may take into consideration the extent and degree which you find from the evidence plaintiff's own negligence caused or contributed to cause the injury, if any, to the plaintiff."

This request of the defendant was refused by the court, and the refusal is assigned as error. The proposition is:

"The jury should have been instructed to find separately the amount of damages the plaintiff had sustained and the extent to which they should be reduced because of plaintiff's contributory negligence, if they should find he was guilty of contributory negligence, or the proportion or relation which plaintiff's contributory negligence bore to the combined negligence of defendant and plaintiff."

We do not think the court committed reversible error in refusing to submit the requested issue. Article 6649, Vernon's Sayles' Texas Civil Statutes, declares that, in actions against a railway company "to recover damages for personal injuries · to an employé, * * * the fact that the employé may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employé." By the court's charge the jury was plainly told that if they should find from the evidence that plaintiff was guilty of contributory negligence to diminish the amount of damages sustained by him on account of his injuries in proportion to the amount of negligence attributable to him. There was no ambiguity in the court's charge and nothing therein to confuse or mislead the jury, and it must be assumed that they understood and obeyed the instructions given them. They must have understood and known from the issues submitted and the instruction given· in connection therewith that, in the event they found that the plaintiff was guilty of contributory negligence, they should reduce the amount of damages suffered by him as a result of his injuries in proportion to the amount of negligence attributable to him, and, being so reduced, the amount remaining should be returned as their award of plaintiff's damages. That the jury in this way arrived at the amount of damages awarded plaintiff cannot be doubted, and, in our opinion, there was no necessity for a separate finding and statement of "the amount of damages the plaintiff had sustained and the extent to which they should be reduced because of plaintiff's contributory negligence," or a finding of "the proportion or relation which plaintiff's contributory negligence bore to the combined negligence of the defendant and the plaintiff." The statute does not require such finding and statement. The requirement simply is that the plaintiff's damages shall be diminished in proportion to the amount of negligence attributable to the

plaintiff as found by the jury, and a statement in their verdict of the amount that his contributory negligence bore to the combined negligence of the parties would, it occurs to us, be of no practical benefit to either the court or the defendant. It ought, it seems to us, to be sufficient for all useful purposes in the case for the court and parties to the suit to know that the damages sustained by the plaintiff have been reduced as required by the statute, and that the amount awarded and stated in the verdict represents the amount found by the jury as the total damages suffered by reason of the injuries complained of, less the amount ascertained by the jury to be chargeable to the plaintiff on account of his contributory negligence. This is especially true, we think, when, as in the present case, it is not claimed that the verdict of the jury is excessive. There is no pretense here that the amount ultimately awarded the plaintiff is excessive, and in such case it is utterly immaterial, it seems to us, in rendering the proper judgment for the court or defendant, to know what sum the jury found the plaintiff would have been entitled to but for his contributory negligence or how much such sum was reduced on account of such negligence. With a statement in the findings and verdict of the jury of said respective amounts, since there is no claim of excessiveness in the amount awarded, no other judgment than the one rendered would have been authorized, and the defendant's rights and remedies under the law would have been practically the same. Railway Co. v. Pace, 184 S. W. 1051, is cited in support of the defendant's assignment and proposition under discussion, and, unless the cases are distinguishable in the fact that the question of excessiveness of the verdict was raised and urged in the case cited, it is in point. In that case the court said:

"Under the particular facts of this case, this court is entitled to know, as was the trial court, what was the basis of the finding of the jury as to the sum allowed plaintiff as damages, so that the question of the sufficiency or excessiveness thereof may be intelligently determined."

No such question is presented in this case for our determination, and hence the reason that appears to have actuated the court in holding that it and the trial court were entitled to know "what was the basis of the finding of the jury as to the sum allowed plaintiff as damages," etc., does not exist in the instant case. But, if it can be said that the views expressed by us are in conflict with the opinion in Pace's Case, then, while recognizing the great ability of the court that rendered it, we are constrained to express our disapproval of that decision and must decline to follow it.

[7] The other assignments of error have been examined with the conclusion reached that neither of them points out reversible error. The issues raised as to the negligence of the plaintiff and the defendant were sufficiently submitted in the charge of the court; and the picture of the muscles described by the physicians, which they testified was correct, was admissible as a part of such description and practically became a part of their testimony. But if for any reason it was error to admit the picture in evidence the error was of no material consequence, and should not require a reversal of the case.

The judgment is affirmed.